## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES LEE DORSEY (#R-03996), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18-cv-07143 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| DR. OKEZIE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Lee Dorsey ("Dorsey"), an Illinois prisoner, filed this *pro se* civil rights action under 42 U.S.C. § 1983, concerning delays in the treatment of his ocular conditions. He asserts claims  against Wexford Health Sources, Inc. ("Wexford") and several healthcare providers who contracted with or are employed by Wexford (collectively, "Defendants"). Dorsey claims that Defendants violated the Eighth Amendment because they were deliberately indifferent to his serious medical needs. Now before the Court is Defendants' motion for summary judgment. (Dkt. No. 153.) For the reasons stated below, the motion is granted in full.

## BACKGROUND

Except where noted, the following facts are undisputed.[1]

---

[1] Dorsey has filed a response to Defendants' motion that contains a response to Defendants' Local Rule 56.1 Statement of Material Facts, a recitation of additional facts and supporting exhibits, and argument. (Dkt. Nos. 164 and 164-1.) L.R. 56.1(e)(3). Dorsey's factual responses at times do not comply with the Local Rules, *see* L.R. 56.1(e)(2), (3), in that he does not cite the record when disputing Defendants' asserted facts and includes legal argument or unsupported conclusions. The Court will disregard these responses. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (court may disregard any part of factual statement or response that consists of legal arguments or conclusions). Moreover, where Dorsey has not properly responded to a certain fact or has admitted it, the Court will accept it as true to the extent supported by the record. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Nonetheless, although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011) (unpublished), it will generously construe the facts identified by Dorsey to the extent they are supported by the record or he could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently).

## I.     The Parties

Dorsey is an inmate in the custody of the Illinois Department of Corrections ("IDOC") inmate serving a life sentence. (Defs.' LR 56.1 Stmt. ("DSOF") ¶ 1, Dkt. No. 155.)

Defendant Wexford contracts with the State of Illinois to provide medical services to inmates at IDOC facilities. Defendant "Estate of Saleh Obaisi, Deceased," is the estate of Dr. Obaisi, who was employed by Wexford as the Medical Director of Stateville Correctional Center from August 2012 until he died in December 2017. (DSOF ¶ 32.) (For simplicity, the Court refers to this Defendant as "Dr. Obaisi".) Defendant Dr. Marlene Henze ("Dr. Henze") was Wexford's on-site medical director at Stateville from October 2018 through December 2023. (DSOF ¶ 18.)[2] The duties and responsibilities of the on-site medical director at a correctional facility are to assess, examine, and diagnose inmates, order diagnostic testing and imaging, and provide the appropriate medical treatment for any injuries, illnesses, ailments, or chronic medical issues. (DSOF ¶ 19.) Defendant Dr. Timothy Fahy ("Dr. Fahy") was employed by Wexford as an optometrist at Stateville beginning in October 2016. (DSOF ¶ 34.) Dr. Fahy's duties and responsibilities as an optometrist at a correctional facility included diagnosing, managing, and treating conditions and diseases of the human eye and visual system, including examining eyes and prescribing corrective lenses. (DSOF ¶ 36.)

## II.     Dorsey's Medical Care and Treatment

Dorsey has been completely blind in his right eye since he was approximately 10 years old, due to a childhood injury. (Pl.'s Resp. ("PRESP") at 5, Dkt. No. 164.)  From approximately 2003 to 2007, Dorsey was remanded from IDOC custody to the Cook County Jail in conjunction

---

[2] An additional Wexford-employed physician, Dr. Okezie, who briefly served as Stateville's medical director in between Dr. Obaisi and Dr. Henze, is also a named Defendant in this lawsuit. But he was never served and is not a party to the summary judgment motion.

with a then-pending appeal. (PRESP at 10.) At some time in 2007, he began experiencing pain,

floaters, and blurred vision in his left eye, and Cook County medical staff prescribed him two

types of eye drops (the names of which he does not recall) to treat those symptoms. (*Id.*; Pl.'s

Dep. ("PDEP") at 28–29, Dkt. No. 155-4.) Dorsey returned to IDOC custody in October 2007,

and he was housed at Stateville until September 2008, then moved to Menard Correctional

Center from September 2008 to March 2009, and then returned back to Stateville where he

remained until his October 2021 transfer to a Pinckneyville Correctional Center. (PRESP at 7;

Second Amend Compl. ("SAC") ¶¶ 21–22, Dkt. No. 63.)

Beginning in 2007, Dorsey began seeking treatment from IDOC for the symptoms in his

left eye. (PRESP at 12.) Over the years prior to 2012, he informed various medical staff at

Stateville of his complaints and showed them the prescriptions from Cook County; yet he was

nonetheless denied treatment for the symptoms concerning his left eye. (*Id.*) Then, starting in

2012, Dr. Obaisi became Stateville's medical director and Dorsey sought treatment from him.

(PDEP at 68–72; SAC ¶¶ 29–30.) Dorsey told Dr. Obaisi about his symptoms, attempted to give

him copies of the Cook County prescriptions, and asked him at multiple appointments to be sent

off-site to an ocular specialist. (*Id.*)  As medical director, if Dr. Obaisi saw an inmate who

presented with or complained of ocular issues, he would refer the inmate to the eye doctor on

staff at Stateville. (DSOF ¶ 32.) Because Dr. Obaisi himself was not an optometrist or ocular

specialist, he deferred to those specialists on matters related to Dorsey's ocular care. (DSOF

¶¶ 32, 64.)

Dr. Obaisi referred Dorsey to an on-site optometrist starting in 2013. (PDEP at 67–68.)

But he did not refer Dorsey off-site to an ocular specialist. (PDEP at 67–68.) Dorsey testified that

Dr. Obaisi told him that he was not referring Dorsey to an outside specialist because "[he] had

3

too many issues, one thing at a time, and one time [Obaisi] made a comment about it cost too much money." (PDEP 70–72.)

As to Dorsey's care on-site at Stateville, Dr Obaisi first referred Dorsey to the on-site optometrist at the time, Dr. Dunn, in 2013. (PDEP at 67–68; PRESP at 36.) On October 10, 2013, Dorsey saw Dr. Dunn and, according to Dorsey, he said that he would refer Dorsey off-site, "but that never happened." (PDEP at 54.) Dorsey's medical records also reflect that he saw a different optometrist in 2015. (PRESP at 37.)

Dorsey first saw Dr. Fahy in his eye clinic at Stateville in December 2016. (DSOF ¶ 6.) Dorsey's medical records of his visits with Dr. Fahy show the following. On December 7, 2016, Dorsey complained of blurry vision, though his vision in his left eye was found to be 20/20 corrected. (DSOF ¶ 6.) Dorsey was diagnosed with presbyopia, and Dr. Fahy ordered new bifocals for him. (DSOF ¶ 6.) Dr. Fahy also ordered Dorsey to return in three months for a repeat tonometry (*i.e.*, a test that measures ocular pressure). (DSOF ¶ 6.)

On May 1, 2017, Dorsey returned for his repeat tonometry. (DSOF ¶ 7.) Dr. Fahy noted that Dorsey's ocular pressures were elevated and that he may have glaucoma[3] in his left eye. (DSOF ¶ 7.) Dr. Fahy therefore prescribed Dorsey an eye drop called Latanoprost. (DSOF ¶ 7.)

On July 21, 2017, Dorsey returned to Dr. Fahy for another repeat tonometry for his left eye. (DSOF ¶ 8.) At this time, Dr. Fahy observed his intraocular pressures to be at target values. (DSOF ¶ 8.) Dorsey was ordered to continue on Latanoprost. (DSOF ¶ 8.)

On January 31, 2018, Dorsey again returned to Dr. Fahy for a repeat tonometry and a general six-month optometry follow up. (DSOF ¶ 9.) Dr. Fahy found no change needed for Dorsey's glasses prescription, and he continued Dorsey on "glaucoma eyedrops." (DSOF ¶ 9.)

---

[3] Dr. Fahy's medical records abbreviate glaucoma to "GLC."

On August 21, 2019, Dorsey returned to Dr. Fahy for an annual exam. (DSOF ¶ 10.) Dr. Fahy found that he had normal ocular pressures on Latanoprost. (DSOF ¶ 10.) Dr. Fahy did observe that Dorsey had conjunctivitis, and so he prescribed Dorsey allergy drops. (DSOF ¶ 10.) Dr. Fahy did not observe a need for new glasses. (DSOF ¶ 10.) But he referred Dorsey for a visual fields exam for evaluation of his "glaucoma treatment efficacy." (DSOF ¶ 10.)

On September 23, 2019, Dorsey returned to Dr. Fahy, after receiving a visual fields exam; Dorsey's vision was 20/20 corrected, and his left eye was stable. (DSOF ¶ 11.) The visual fields exam did indicate some generalized depression of visual field sensitivity on the left and trace nuclear sclerosis (also known as cataracts) for which Dr. Fahy prescribed Latanoprost. (DSOF ¶ 11.)

On June 22, 2020, Dr. Fahy saw Dorsey for a follow-up on his "glaucoma treatment" and found Dorsey to have normal intraocular pressure and 20/20 vision corrected in his left eye. (DSOF ¶ 12.) Dr. Fahy continued to prescribe Latanoprost. (DSOF ¶ 12.)

On March 5, 2021, Dorsey returned to Dr. Fahy for a six-month follow up and repeat tonometry. (DSOF ¶ 13.) Dorsey had 20/20 corrected vision in his left eye, and his intraocular pressures were stable. (DSOF ¶ 13.) His fundus in his left eye was normal, though there was trace nuclear sclerosis. (DSOF ¶ 13.) Dr. Fahy determined there was no need for a change in glasses, but he referred Dorsey for visual fields testing for a "comparison study for glaucoma treatment." (DSOF ¶ 13.)

On March 24, 2021, Dr. Fahy observed that Dorsey's tonometry results showed intraocular pressure at a stable value, with visual fields testing still pending. (DSOF ¶ 14.) He continued to prescribe Latanoprost eyedrops. (DSOF ¶ 14.)

On September 22, 2021, Dorsey saw Dr. Fahy for the last time before Dorsey was transferred out of Stateville, again for a repeat tonometry. (DSOF ¶ 15.) Dorsey's vision was 20/20 corrected in the left eye. (DSOF ¶ 15.) Dr. Fahy observed sensitivity reduction in Dorsey's left eye on visual fields testing. (DSOF ¶ 15.) He also observed trace nuclear sclerosis, but Dorsey's intraocular pressures were normal. (DSOF ¶ 15.) He ordered new bifocals for Dorsey and a new kind of eye drop called Brimonidine. (DSOF ¶ 15.)

Dr. Fahy also testified via affidavit in this case. He testified that when he saw an inmate, he would first perform an examination to triage or diagnose the cause of an inmate's complaints. (DSOF ¶ 42.) If after completing the examination Dr. Fahy determined that the inmate needed care from an outside ocular specialist, Dr. Fahy would submit that recommendation for review by a utilization review physician. (DSOF ¶ 42.) Conversely, if Dr. Fahy was able to treat the inmate's complaints inside the facility, he would do so. (DSOF ¶ 42.)

Dr, Fahy testified that he saw Dorsey on a routine basis for monitoring and treatment of elevated ocular pressure in his left eye. (DSOF ¶ 43.) Throughout his treatment of Dorsey, Dr. Fahy monitored his ocular pressure, prescribed Latanoprost eye drops to maintain stable ocular pressure, conducted vision testing and examinations, and adjusted his prescriptions for eyeglasses as needed. (DSOF ¶ 43.) He testified that once he placed Dorsey on Latanoprost eye drops, Dorsey's ocular pressure in his left eye remained within normal limits. (DSOF ¶ 44.) Therefore, Dr. Fahy continued him on the eye drops to maintain stable ocular pressure in his left eye and completed routine tonometry testing to examine Dorsey's ocular pressure. (DSOF ¶ 44.) Dr. Fahy states that this approach was within the standard of care. (DSOF ¶ 44.)

Dorsey testified that the eye drops Dr. Fahy prescribed did bring the pressure in his eye down and helped with "some pain." (PDEP at 48, 119.) But he "does not know if the treatment

was proper" because his other symptoms, such as floaters, some pain, and irritation, persisted. (PDEP at 48.) Dorsey was frustrated because Dr. Fahy would not tell him the reason he had prescribed the eye drops, never gave him a diagnosis, and would not recommend that he be referred off-site, despite Dorsey asking him four or five times. (PDEP at 48, 52, 55.) Dorsey testified that Dr. Fahy told him "no" when Dorsey asked Dr. Fahy whether he had any eye diseases, although Dr. Fahy did later mention that Dorsey had traces of nuclear sclerosis. (PDEP at 52.) Dorsey further testified that Dr. Fahy never gave him a reason for declining to send him off-site, instead suggesting that it was up to the medical director. (PDEP at 55.) Nonetheless, Dorsey testified that he would not use the term "dissatisfied" to describe his assessment of Dr. Fahy's treatment, and Dorsey thinks that Dr. Fahy "did what he thought was best." (DSOF ¶ 57; PDEP at 53.) Dorsey also testified that he suspected "it was too late" once he started to receive treatment from Dr. Fahy. (PDEP at 49.)

As to Dr. Henze, like Dr. Obaisi, if she saw an inmate who presented with or complained of ocular issues, she would refer the inmate to see the optometrist at Stateville. (DSOF ¶ 26.) Dr. Henze did not provide Dorsey with care or treatment for his ocular issues but instead deferred to Stateville's optometrist. (DSOF ¶ 27.) Dorsey claims that during her tenure as medical director, he asked Dr. Henze five to six times to be sent off-site to an ocular specialist. (PDEP at 81.) She told Dorsey a couple of times that she would recommend it "but had to go through collegial" first. (PDEP at 81.) After Dorsey's September 2021 appointment with Dr. Fahy, he handed his optometry reports to Dr. Henze in the urgent care clinic. (PDEP at 83–84.) Dorsey then had an appointment with her on an unrelated medical issue. (PDEP at 83–84.) Dorsey asked Dr. Henze to refer him to an outside ocular specialist and also spoke to Dr. Henze about a University of

7

Illinois – Chicago ("UIC") doctor's recommendation on the unrelated issue. (PDEP at 83–84.) According to Dorsey, she responded, "one thing at a time." (PDEP at 83–84.)

Then, on October 27, 2021, Dorsey was transferred to Pinckneyville. (DSOF ¶ 16.) On December 13, 2021, Dorsey saw a Wexford optometrist at Pinckneyville named Dr. Gentry, who told Dorsey he had glaucoma in his left eye. (PDEP at 43–44.) His medical record from that visit shows that Dr. Genrty recommended that Dorsey continue on Latanoprost and Brimonidine. (PRESP at 142.) Dorsey testified about his understanding that those drops are used to treat glaucoma. (PDEP 45–46.) He also testified that they helped with the pressure, irritation, and pain, but not the floaters.  (PDEP at 45–46.)

At the end of December 2021, Dorsey was transferred again—this time to Dixon Correctional Center , where he is currently housed. (PDEP at 43–44.) Dorsey was seen at Dixon by a Wexford optometrist named Dr. Popovich on January 5, 2022. (PRESP at 44.) Dorsey complained of glaucoma. (PRESP at 44.) Dr. Popovich noted that Dorsey's intraocular pressure was elevated and stated, "consider adding drops at next visit." (Dorsey testified that there had been a brief lapse in receiving his drops at that time due to his transfers.) (PRESP at 44.) At an appointment on March 2, 2022, Dr. Popovich noted that Dorsey's intraocular pressure had improved and was stable. (PRESP at 45.) Dr. Popovich suspected ocular migraines. (PRESP at 45.) Dixon's medical director noted on March 10, 2022, that he would therefore prescribe Excedrin migraine, and Dorsey testified that he was still taking Excedrin migraine at the time of his deposition in this action in January 2024. (PRESP at 46; PDEP at 60.)

Then, in September 2022, Dr. Popovich referred Dorsey to the eye clinic at UIC hospital due to "mild open angle glaucoma" in his left eye. (PRES at 49.)  An ophthalmologist at UIC noted that Dorsey's corrected vision in his left eye was 20/20 and that his intraocular pressure

was normal while on the Latanoprost and Brimonidine. The ophthalmologist found a "deep cup

of the optic nerve." (PRESP at 48–49.) His assessment was "glaucoma suspect," and his only

recommendation was to return to the clinic in two to three months. (PRESP at 48–49.) Dorsey

testified that he saw the UIC ophthalmologist again in December 2023, and he again told Dorsey

that he was "a glaucoma suspect." (PDEP at 43.) Dorsey also stated that the UIC

ophthalmologist prescribed him transitional tinted eye-glasses at some point in the 2022–2023

time period. (PRESP at 17.)

Dorsey testified that at the time of his deposition (*i.e.*, in January 2024), he was still

taking both Latanoprost and Brimonidine, and that those medications relieve pressure in his eye

and help with the pain. (PDEP at 105.) However, he still has floaters, blurred vision, some pain,

and ocular migraines. (PDEP at 105.)

### III.     Relevant Procedural History

Dorsey initiated this lawsuit in October 2018. (Dkt. No. 1.) In October 2019, the Court

granted Dorsey's motion for attorney representation and recruited *pro bono* counsel to investigate

his claim. The Court determined that recruited counsel was appropriate in light of Dorsey's

allegations that the condition in his left eye was on-going. (Dkt. No. 12.) However, the Court

subsequently allowed Dorsey's first recruited counsel to withdraw after they reported an inability

to proceed with his case consistent with their obligations under Federal Rule of Civil Procedure

11. The request to withdraw was made after counsel had investigated Dorsey's optometry

records with the help of a consulting expert. (Dkt. Nos. 29, 31.) Given the nature of Dorsey's

concerns, the Court nonetheless recruited *pro bono* counsel again to provide a second look at his

concerns. (Dkt. No. 34.) That second counsel also moved to withdraw based on their Rule 11

obligations (Dkt. No. 42), and at the time, Dorsey submitted a response to the motion indicating

9

that he was prepared to proceed *pro se* (Dkt. No. 43). The Court thus granted the motion to withdraw and found that it would be inappropriate to recruit additional counsel. (Dkt. No. 46.)

### IV.    The Operative Claims

Dorsey filed the now-operative *pro se* Second Amended Complaint ("SAC") in this action in December 2021. (*See* Dkt. No. 54.) In August 2022, this Court screened the proposed SAC and allowed Dorsey to proceed on claims of deliberate indifference to his serious medical needs against Dr. Obaisi, Dr. Okezie, Dr. Henze, and Dr. Fahy, as well as a claim against Wexford under *Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978). (*See* Dkt. No. 63.) Although Defendants assert in their reply brief that the Court limited Dorsey's claims against these Defendants to the time period of 2016 to 2021, the Court's screening order made no such finding. Nor do Defendants explain why such a time limitation would be proper. It is true that Dorsey's SAC initially included several specific allegations against Dr. Obaisi dating as far back as 2012 and 2013. But the Court's screening order did not single out and discuss those specific allegations, nor did it discuss every single other allegation in the SAC. But that silence does not mean the Court found those allegations time-barred without any discussion to that effect.

Dorsey's claim is a continuing violation. *See Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) (where there is an alleged ongoing denial of medical treatment, the violation is "continuing," and the claim does not accrue "so long as the defendants had the power to do something about [plaintiff's] condition.") The Court in fact explicitly dismissed two prior medical directors at Stateville from the continuing violation on the basis that their tenures had ended in 2010 and 2012—more than two years prior to when Dorsey initiated this action in 2018.

The Court made no similar findings imposing a time limit on any part of Dorsey's claims against any remaining Defendant.

## **LEGAL STANDARD**

At the summary judgment stage, the movant has the burden of showing that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that might affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). But a bare-bones contention by the non-moving party that an issue of fact exists does not create a genuine factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up).

## **DISCUSSION**

The Court understands Dorsey to seek to hold Defendants liable on the following grounds. First, although Dorsey testified that for the most part, he was not dissatisfied with Dr. Fahy's care, he nonetheless challenges the care as inadequate and seeks to hold Dr. Fahy liable because he purportedly did not diagnose him and because some of his symptoms persisted. Second, Dorsey seeks to hold all three individual Defendants liable because they each failed to refer him, or at least recommend his referral, to an outside ocular specialist. Third, Dorsey seeks to hold Dr. Obaisi liable for the initial delay in receiving even on-site care, which he believes came "too late." And lastly, Dorsey seeks to hold Wexford liable under a *Monell* theory because

he believes that Wexford's policies directing its treaters to consider cost drove the decision to deny him access to an off-site specialist.

"The Eighth Amendment's prohibition on cruel and unusual punishment protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (cleaned up). To prevail on a claim that his medical care violated the Eighth Amendment, Dorsey must establish that: (1) he suffered from an objectively serious medical condition and (2) the defendants were deliberately indifferent to that condition. *See id.* at 1022 (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)). And to support any of his theories that the Defendants impermissibly delayed providing him treatment, he must present not only evidence of deliberate indifference but also verifying medical evidence that the delays, rather than the underlying conditions, caused harm. *See McMillen v. Wexford Health Sources, Inc.*, No. 23-1836, 2025 WL 2543981, at *2 (7th Cir. Sept. 4, 2025) (citing *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 678 (7th Cir. 2023). Defendants do not dispute that Dorsey's ocular issues were a serious medical condition, and so the question is whether Dorsey has presented enough evidence to allow a reasonable jury to conclude that Defendants were aware of yet disregarded an excessive risk to his health and that any delays caused him injury.

## I. Individual Defendants: Dr. Obaisi, Dr. Fahy, and Dr. Henze

Deliberate indifference consists of more than negligence or malpractice; instead, the defendant must know of and disregard an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The requisite culpable state of mind for deliberate indifference is akin to criminal recklessness. *See, e.g., Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Because Dr. Fahy made

significant efforts to treat Dorsey's ocular symptoms, the Court must find evidence that the treatment was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" in order to infer culpability. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). Put differently, "[t]o survive summary judgment," an inmate "need[s] to present evidence sufficient to show that [a medical professional's] decision was so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 664 (7th Cir. 2016) (internal quotation marks and citation omitted). Defendants contend that no reasonable jury could consider the totality of the treatment provided to Dorsey for his ocular-related complaints and determine that the care evidenced deliberate indifference. The Court agrees.

Throughout Dr. Fahy's treatment of Dorsey from 2016 through 2021, he tested and monitored Dorsey's ocular pressure, prescribed him Latanoprost and later Brimonidine drops to maintain stable ocular pressure, conducted vision testing and examinations, and adjusted his prescriptions for eyeglasses as needed. Once he was placed on Latanoprost in May 2017 at his second appointment with Dr. Fahy, Dorsey's ocular pressure in his left eye remained within normal limits. Thereafter, Dr. Fahy continued to treat him with eye drops and completed regular tonometry testing to examine his ocular pressure. Dorsey's corrected vision in his left eye also remained at 20/20. And he testified that the eye drops relieved the pressure in his eye and alleviated some of his pain. There is nothing in this sequence of events, or anything else in the record, suggesting that the medical decisions made by Dr. Fahy were "so far afield of accepted professional standards as to raise the inference that [they] [were] not actually based on medical

judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Johnson*, 936 F.3d at

707; *Whiting*, 839 F.3d at 664. In light of the care he provided to Dorsey, no reasonable jury

could find an Eighth Amendment violation on the part of Dr. Fahy or, for that matter, on the

parts of Dr. Obaisi or Dr. Henze, both of whom reasonably deferred to Dr. Fahy. *See Kyles v.*

*Williams*, 679 F. App'x 497, 499–500 (7th Cir. 2017) (prison medical professionals were entitled

to summary judgment because a series of appointments and reasonable medical attention for

prisoner's knee issues demonstrated that providers did not consciously disregard a serious risk of

harm). In short, the record cannot support a finding of the near "total unconcern" for the

prisoner's welfare that is characteristic of deliberate indifference. *See Rasho v. Jeffreys*, 22 F.4th

703, 710 (7th Cir. 2022).

Dorsey primarily faults Dr. Fahy for not reaching a diagnosis and telling him that he did

not suffer from eye disease, when later treaters either diagnosed him with glaucoma or

"suspected glaucoma" and the optometrist at Pinckneyville additionally diagnosed him with

ocular migraines. But regardless of what Dr. Fahy told Dorsey verbally in their conversations,

his medical records clearly state that he "suspected glaucoma," and he repeatedly and explicitly

referenced the monitoring of Dorsey's eye pressure and the prescriptions for Latanoprost and

Brimonidine as "glaucoma treatment." Indeed, Dorsey's later treaters—namely, the optometrists

at Pinckneyville and Dixon, and even the UIC ophthalmologist—treated Dorsey's glaucoma or

suspected glaucoma in precisely the same way as did Dr. Fahy.  Additionally, the Court notes

that the Pinckneyville optometrist did not diagnose Dorsey with ocular migraines, but rather

noted that he "suspected" them. In any event, the mere fact that another treater might have

reached an additional diagnosis does not show that Dr. Fahy's treatment was deliberately

indifferent. *See Scott v. Khan*, No. 20 C 4120, 2022 WL 3576682, at *5 (N.D. Ill. Aug. 19, 2022)

("a mere difference of opinion" between medical professionals does not show that care was inadequate). This is particularly true where, as here, there is no evidence that Dorsey ever complained of headaches to Dr. Fahy, and Dorsey has testified that his eye pain persisted even once he began taking Excedrin migraine.

Dorsey also faults Dr. Fahy because, while his treatment relieved the pressure in his eye and some of his pain, Dorsey continued to experience some floaters and some continued eye pain and irritation. Although it is unfortunate that Dorsey continued (and continues even now that he is under the care of a UIC ophthalmologist) to suffer some ocular symptoms and eye discomfort, constitutionally adequate care does not require the total alleviation of pain and discomfort. *See Garza v. Wexford Health Sources, Inc.*, No. 19-2321, 2022 WL 3443775, at *10 (C.D. Ill. July 18, 2022) (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)); *Arce*, 75 F.4th at 681 (Eighth Amendment "does not . . . impose the unrealistic requirement that doctors keep patients completely pain-free"); *Leiser v. Hoffman*, No. 20-2908, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) ("doctors are not deliberately indifferent when they are unable to eliminate completely a patient's pain"); *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1104 (N.D. Ill. 2018) ("the Constitution guarantees . . . treatment within the applicable standard of care, not a specific outcome."). Notably, Dorsey's eyesight has not deteriorated—the medical records reflect that his corrected vision in his left eye remained 20/20 throughout.

Dorsey next faults all three of his treaters because they did not refer him to an off-site ocular specialist. A prison physician's decision to refer a prisoner to a specialist involves the exercise of medical judgment. *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). The refusal or delay in making of a referral supports a claim of deliberate indifference only if the failure to do so is blatantly inappropriate. *Id*. In particular, if the need for specialized expertise was either

15

known by the treating doctor or would have been obvious to a lay person, the "obdurate refusal" to engage specialists permits an inference of deliberate indifference. *Id.*

No evidence in the record here suggests that it was "blatantly inappropriate" to treat Dorsey onsite rather than offsite given the nature of his complaints. First and foremost, from 2016 onwards, Dorsey was in fact under the care of an eye specialist—namely, Dr. Fahy—to whom the medical directors referred Dorsey to care for his ocular symptoms. Dorsey has introduced no evidence to suggest that optometrists like Dr. Fahy are not qualified to treat suspected glaucoma or address complaints like those he experienced. Dorsey's own personal desire to see a second specialist outside the prison is not enough to establish deliberate indifference. *See Lewis v. Sood*, 126 F.4th 525, 531–32 (7th Cir. 2025). ("A prisoner's mere disagreement with the course of treatment is not evidence of deliberate indifference."); *Broadfield v. Williams*, 768 Fed. App'x 544, 549 (7th Cir. 2019) (explaining that prisoner "was not entitled to his preferred set of medications and treatments," so long as his medical providers "did not act recklessly"); *Williams v. Patton*, 761 Fed. App'x 593, 597 (7th Cir. 2019) ("mere disagreement with a medical professional's otherwise reasonable treatment is not a basis for a constitutional claim") (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The Constitution guarantees treatment only within accepted professional standards so "an inmate is not entitled to demand specific care." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019).

Moreover, as Defendants argue, Dorsey has not brought forward evidence demonstrating that he was injured due to the failure to refer him for off-site treatment. As the Seventh Circuit has explained: "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of the

failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (citation omitted). Here, Dorsey's vision did not worsen under Dr. Fahy's care. And when Dorsey did later go to UIC's eye clinic in 2022, once he was housed at Dixon, the outside ophthalmologist's assessment and care plan essentially mimicked that of Dr. Fahy. The UIC physician made no additional diagnosis, nor did he offer any additional treatment at that time. Dorsey therefore cannot establish a redressable injury based on not being referred for outside care sooner.

Finally, Dorsey also contends that Dr. Obaisi delayed referring him for treatment, even inside Stateville, for years. Dorsey, though, has not shown that this delay caused him harm. First, the Court notes that Dr. Obaisi in fact referred Dorsey to an optometrist, Dr. Dunn, as early as October 2013—around a year after Dr. Obaisi became medical director in August 2012. Although, according to Dorsey, Dr Dunn's promise of an off-site referral "did not happen," Dorsey has not introduced evidence of Dr. Obaisi's personal involvement in whatever transpired with respect to a referral. Dr. Obaisi cannot be liable for any delay in treatment absent any indication that he was aware of and disregarded Dorsey's requests for treatment. *See Smith v. Rohana*, 433 F. App'x. 466, 469 (7th Cir. 2011) (medical director, "like any defendant sued under § 1983," could not be liable absent personal involvement in the aspect of prisoner's care about which he complains).

Dr. Obaisi continued referring Dorsey to on-site optometrists, and because Dr. Fahy did ultimately start treating Dorsey's symptoms, the issue before the court is one of delay, not denial, of medical treatment. *See Johnson v. Obaisi*, No. 16-cv-4046, 2020 WL 433872, at *5 (N.D. Ill. Jan. 28, 2020). The Seventh Circuit, in a case about a delay in ocular care, recently reiterated the

rule in this Circuit that a plaintiff is obligated to bring forth "verifying medical evidence" that the alleged delays of which he complains, rather than the underlying condition itself, caused him "some degree of harm." *McMillen*, 2025 WL 2543981, at *2 (affirming summary judgment for prison treaters who had failed to follow eye specialist's recommended timeline because plaintiff lacked medical evidence that his permanent loss of vision was caused by delays rather than underlying eye conditions); *see also Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm.").

While expert testimony can be verifying medical evidence, medical records can also suffice. *Id.*; *see also Walters v. Germaine*, No. 19-cv-763, 2023 WL 2374346, at *3 (S.D. Ill. Mar. 6, 2023) (verifying evidence can include expert opinions, medical records, treatment notes or physician notes). But medical records that evidence merely delayed diagnosis and treatment, standing alone, are insufficient to meet this requirement if they would not assist a jury in determining that the delay exacerbated the plaintiff's condition or otherwise caused harm. *Walters*, 2023 WL 2374346, at *3; *McMillen*, 2025 WL 2543981, at *2 (explaining that jury could not make "such a medically complex determination [whether delay or condition caused harm] based solely on medical records that contain a "bare recitation of treatment received" and "an unadorned schedule for follow-up appointments"). Additionally, a plaintiff's own testimony that he experienced untreated symptoms during the delay also does not suffice. *Lisle v. Eovaldi*, No. 16-cv-00422, 2020 WL 1287947, at *7 (S.D. Ill. Mar. 18, 2020) (citing *Johnson v. Obaisi*, No. 16-cv-4046, 2020 WL 433872, at *7 (N.D. Ill. Jan. 28, 2020)).

Yet the sole evidence on the issue in this case consists of Dorsey's complaints that he experienced untreated symptoms. Nothing in Dr. Fahy's (or Dorsey's later treaters') medical records demonstrates that a delay in treatment caused Dorsey a distinct injury separate from his underlying condition. Unlike in *McMillen*, Dorsey's vision did not even deteriorate during that time. Dorsey repeats throughout his response that Dr. Fahy's treatment "came too late," and he appears to believe that the reason some of his symptoms persist is because they were not addressed sooner. But Dorsey does not point to any specific medical record or other evidence supporting his belief and speculation. This is not enough to defeat summary judgment. *See generally Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (a party "must present more than mere speculation or conjecture to defeat a summary judgment motion").

For all the reasons discussed above, Dorsey has not brought forth any evidence that his treaters—Dr. Obaisi, Dr. Fahy, and Dr. Henze—deliberately disregarded his ocular condition or that any of their treatment decisions caused him harm. Therefore, summary judgment is appropriate for the individual Defendants.

## II.    *Monell* Claim against Wexford

The liability of a private corporation like Wexford acting under color of state law is evaluated under the *Monell* standard that applies to municipalities. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). Municipalities and corporations acting under color of law are not vicariously liable for the constitutional torts of their employees or agents. *Id.* Rather, they are liable under § 1983 only for their own constitutional violations. *Id.*

To establish such a violation, a plaintiff must show that he was deprived of a federal right. *Id.* (citing *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir.

2021)). Beyond that, he must link the deprivation of that right to a policy or custom of the entity, meaning "(1) an express policy that causes a constitutional deprivation when enforced, (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* In sum, the plaintiff must bring forth evidence that the entity's actions caused him to suffer a deprivation of his rights, and that the entity took the action "with conscious disregard for the known or obvious risk of the deprivation." *Id.* at 236.

Here, Dorsey claims that Wexford's cost-cutting policies drove his treaters' decision not to refer him to an off-site specialist, which he says is evidenced by comments they made to him about cost. But the absence of an injury to Dorsey from being treated on-site rather than off-site is dispositive not only as to his claims against the individual Defendants but also as to his *Monell* claim against Wexford. Certainly, it is not impossible to find *Monell* liability in the deliberate indifference context even where no one individual actor had a sufficiently culpable state of mind. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) ("Without the full picture, each person might think that her decisions were an appropriate response to a problem; her failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible.") Here, however, Dorsey's individual liability claims about off-site treatment are doomed for lack of an injury caused by the individual Defendants, not merely for lack of state of mind. In such a case, *i.e.,* with no evidence of injury caused by being treated on-site rather than being referred off-site, there can likewise be no *Monell* liability. "A predicate to recovery under *Monell* is, of course, a constitutional injury." *Carr v. City of N. Chicago*, 908 F. Supp. 2d 926, 930 (N.D. Ill. 2012)

20

(distinguishing injury and state of mind in *Monell* cases where there was no individual liability). Summary judgment is therefore appropriate for Wexford.

For all the above reasons, the Court grants summary judgment in favor of Defendants and terminates this case.

## **CONCLUSION**

For all the above reasons, Defendants' motion for summary judgment (Dkt. No. 153) is granted. All claims as to all Defendants have been resolved.[4] The Clerk will enter final Judgment in favor of Defendants. If Dorsey wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Dorsey desires to seek leave to proceed *in forma pauperis* on appeal, he must file a motion in this Court. *See* Fed. R. App. P. 24(a)(1).

Dated: September 29, 2025

Andrea R. Wood
United States District Judge

---

[4] The Court provided Dorsey ample instruction, opportunity, and assistance to effect service on Dr. Okezie, but he never did so. (Dkt. Nos. 95, 106, 111.) Consequently, Dr. Okezie is dismissed as a Defendant. *See* Fed. R. Civ. P. 4(m).